UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | No. 4:24-cr-00169 JAR/JSD |
| VENKATESH SATTARU, ) | |
| NIKHIL PENMATSA, ) | |
| SRAVAN PENUMETCHA, ) | |
| NITYA SATTARU, ) | |
| ) | |
| Defendants. ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT PENMATSA'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**

Comes Now the United States of America, by and through its undersigned attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Dianna R. Collins, Assistant United States Attorney, and in response to defendant Penmatsa's Motion to Suppress Statements and Evidence ("Motion"), and based upon the anticipated testimony by the officers at any hearing on defendant's motion, the United States briefly states:

**FACTS**

On November 29, 2023, police officers with Saint Charles County Police Department responded to 3901 Highway D., Defiance, MO 63341 for a welfare check. Calls to 911 stated that a third party met P.M. approximately three days prior and observed markings on his body. P.M. contacted the third party on November 29, 2023, stating that he needed help.

Upon police arrival, there was no initial answer to the front door. After initial knocks at the front door, P.M. ran out of the front door of the house towards police. It was observed that P.M. was very anxious and there was dried blood above his left eye and markings across the back of his hands. P.M. advised that he was extremely nervous to speak to police in front of his residence because he feared that the other residents would punish him and harm his family in India. P.M. was taken to the police vehicle and placed in the back seat to further discuss.

P.M. stated that he was an international student from India and that defendant Sattaru ("Sattaru") had paid for him to come to the United States. P.M. stated that he had lived at 3901 Highway D. for approximately 2 months and prior to that he lived with Sattaru at 324 Chestnut Creek Circle, O'Fallon, MO 63368. P.M. detailed an extended history of abuse by defendant Penmatsa ("Penmatsa") and defendant Penumetcha ("Penumetcha"). While speaking with P.M., P.O. Easton arrived on the scene. P.O. Mallett advised P.M. that officers would need to speak to the other residents at the property. P.M. provided consent for the officers to go inside the residence.

With consent, and after knocking on the front door without response, P.O. Mallett and P.O. Easton contacted Penmatsa and Penumetcha inside the residence and asked them to sit in the living room. P.O. Mallett spoke with Penmatsa and Penumetcha regarding P.M.'s allegations of abuse. Meanwhile, P.O. Easton conducted a protective sweep of the home. After speaking with Penmatsa and Penumetcha, both were transported to Saint Charles County Police Department for further questioning.

Once at the police station, P.O. Robic assisted The Bureau of Field Operations with an interview of Penmatsa. Upon entering the interview room, P.O. Robic read Penmatsa his constitutional rights, per Miranda, directly from the printed department card. Penmatsa verbally

acknowledged that he understood his rights.   After speaking with Penmatsa for approximately 10 min, P.O. Robic left the room. Upon return and prior to re-questioning, P.O. Robic once again read Penmatsa his constitutional rights, per Miranda, directly from the printed department card. Once again, Penmatsa verbally acknowledged that he understood his rights.

## ARGUMENT

### I.   P.M. Provided Voluntary Consent To A Search Of The Residence

 Though police officers generally need a warrant to enter a home to search or make an arrest, they do not need one when someone possessing common authority over the home voluntarily consents to their entry. United States v. Cobo-Cobo, 873 F.3d 613, 615 (8th Cir. 2017), citing Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). Common authority over premises exists where there is mutual use, and joint access or control. United States v. Matlock, 415 U.S. 164, 171 n. 7 (1974). The authority to consent to a search of a general area obviously extends to objects in plain view within the area. United States v. Wright, 971 F.2d 176, 180 (8th Cir. 1992).

Here, P.M. met police officers outside his residence and provided consent for officers to enter the residence, indicating that they would locate the individuals whom P.M. accused of mentally and physically abusing him.  Penmatsa does not argue that P.M. did not live at the residence or did not have authority to provide consent to the police officers.  With P.M.'s consent, agents were permitted to enter the residence and locate Penmatsa inside the residence without the need for a search warrant.

### II.   Penmatsa Was Not In Custody While At His Residence

Police officers did not have any evidence or reasonable suspicion that a crime had occurred when they entered Penmatsa's residence. Police officers did not know the veracity of P.M.'s claims of physical and mental abuse or whether Penmatsa played a role in any such

abuse. Police officers responded to the 911 call and followed the same protocol that they follow in most domestic calls -by separating the accused and accuser and hearing both sides of the conflict.

This matter is wholly distinguishable from the case Penmatsa cites in his Motion. In Orozco v. Texas, 394 U.S. 324 (1969), police received a call regarding a shooting. At the scene of the incident, police spoke with witnesses who identified the defendant as being the shooter. Police then arrived at the defendant's home with the purpose of arresting the defendant. At the motion hearing, police officers openly admitted in testimony that the defendant was not free to leave police custody once police officers arrived at defendant's home.

In contrast, here, the police did not arrive at 3901 Highway D with the intent to arrest anyone. P.O. Mallett arrived at the scene by himself in response to a call to gather facts and at numerous times while speaking with both P.M. and Penmatsa, police officers made it clear that they were just "trying to figure out what was going on".

An individual is in custody if he has been formally arrested or if his freedom of movement has been restricted to a degree associated with a formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983). In determining the question of custody, the court first looks to the circumstances surrounding the interrogation. Thompson v. Keohane, 516 U.S. 99, 112 (1995). Given those circumstances, the court then asks whether a reasonable person would have felt at liberty to terminate the interrogation and leave. Id. The critical inquiry centers on whether the person's freedom to depart was restricted in any way. *United States v. LeBrun,* 363 F.3d 715, 720 (8th Cir.2004). In making this inquiry, the court looks to the totality of the circumstances from an objective viewpoint, and not the subjective views of either the suspect or the officers. Stansbury v. California, 511 U.S. 318; LeBrun, 363 F.3d at 720.

After entering the residence, P.O. Mallett and P.O. Easton encountered Penmatsa and Penumetcha and directed them to sit in the living room. P.O. Mallet mainly questioned Penmatsa and Penumetcha while P.O. Easton questioned P.M. outside the residence.  At that time, P.M., Penmatsa nor Penumetcha were in custody and therefore did not receive any Miranda warnings.

Looking to the totality of the circumstances, Penmatsa was not in custody when he answered P.O. Mallett's questions. On the one hand, Penmatsa did not initiate this encounter. The officers approached him to ask about the P.M.'s allegations, and did not inform him that he was free to leave. On the other hand, Penmatsa was in his own living room and was not restrained during the period of questioning.  Additionally, officers explained several times that they were "just trying to figure out what was going on" and officers did not employ any strong-arm tactics during the questioning. After Penmatsa answered the questions, Penmatsa was not placed in handcuffs or formerly arrested. This held true even as he rode in the patrol car to the police station for additional questioning.   Under the circumstances, Penmatsa was not in custody. See United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir.1990) (listing factors to consider in conducting custody analysis). Here, the officers were not required to advise Penmatsa of his Miranda rights while being questioned at his residence and any self-incriminating statements made at that time should not be suppressed.

### III. Penmatsa Was Adequately Advised Of His Miranda Rights At The Police Station And Knowingly And Intelligently Made The Decision To Waive Them

In Miranda, the Supreme Court established that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." Davis v. United States, 512 U.S. 452 (1994).  A defendant's waiver of his Miranda rights must be made

voluntarily, knowingly, and intelligently. Id. When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court considers two "distinct dimensions":

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."'

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011). "The Government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004). A finding of police coercion is "a necessary prerequisite to a determination that a waiver was involuntary." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998).

In assessing whether a waiver was voluntary, a court examines the totality of the circumstances to determine whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010). Relevant circumstances include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id.

Penmatsa's waiver was voluntary. There is no evidence that Penmatsa's waiver resulted from coercive police conduct. To the contrary, the audio recording and transcript of the interrogation establish that the tone of the interrogation was conversational and the agents did not use threats or violence.

Additionally, Penmatsa's waiver was knowingly and intelligent. Penmatsa's status as a relatively recent immigrant did not prevent him from voluntarily waiving his Miranda rights. In

the cases that Penmatsa cited in his Motion, the immigrants who were being interviewed did not have command of the English language and required interpreters. That is not Penmatsa's situation.  Penmatsa spoke with police officers in his home.  During this conversation, he was able to understand and immediately respond to police requests and questions. Additionally, Penmatsa demonstrated a high level of English mastery in his ability to understand and participate in jokes, profanity, and idioms.  At no point during his conversation with police officers did Penmatsa ask officers to repeat or rephrase themselves.  Additionally, at no point during the conversation did Penmatsa respond to a question or request in an off manner that would suggest a language barrier.

Penmatsa seems to suggest that simply because Penmatsa is an immigrant that he lacks the ability to understand his rights.  However, this bare assertion fails to show any diminished capacity to resist coercion due to a mental defect.  Penmatsa was not under the influence of any drugs or alcohol that may have impaired his judgment. Although Penmatsa lacked experience with the criminal justice system, this alone is insufficient to show his waiver was not made knowingly and intelligently, particularly where P.O. Robic confirmed that Penmatsa understood his rights more than once. The overall tenor of the police station interview confirms this. Throughout the interview, Penmatsa answered all questions promptly and appropriately, and in turn asked relevant questions of P.O. Robic, indicating he has at least average intelligence. Therefore, under the totality of the circumstances of the interview, Penmatsa waiver was made knowingly and intelligently.

For all the reasons discussed, the government requests this Court deny defendant Penmatsa's Motion to Suppress Statements and Evidence.

Respectfully submitted,

SAYLER FLEMING

United States Attorney

*/s/   Dianna R. Collins*

DIANNA R. COLLINS, 59641Mo

Assistant United States Attorney

111 S. Tenth Street, 20th Floor

St. Louis, Missouri 63102

(314) 539-2200

**CERTIFICATE OF SERVICE**

    I hereby certify that on January 17, 2025, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/   Dianna R. Collins*

Dianna R. Collins, #56961MO

Assistant United States Attorney